J-S35033-25

2025 PA Super 275

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                 :         PENNSYLVANIA
                                 :
            v.                   :
                                 :
                                 :
                                 :
KEWUAN KANTRELL JONES            :
                                 :
            Appellant            :   No. 230 MDA 2025

Appeal from the Judgment of Sentence Entered January 21, 2025
In the Court of Common Pleas of Lancaster County Criminal Division at
            No(s):  CP-36-CR-0003311-2024

BEFORE:  OLSON, J., MURRAY, J., and LANE, J.

OPINION BY LANE, J.:                    **FILED: DECEMBER 10, 2025**

Kewuan Kantrell Jones ("Jones") appeals from the judgment of sentence imposed following his convictions for robbery, theft by unlawful taking, and simple assault.[1] Jones claims that the Commonwealth was required to produce an expert at trial to introduce into evidence the GPS timeline data that police recovered from the Google Maps app installed on his cell phone and tablet. We hold that the Commonwealth did not need to present an expert to submit this data into evidence, as the testifying officer who introduced it as a lay witness at trial did not offer any scientific, technical, or other specialized knowledge, but merely relayed GPS data that the Google Maps app automatically calculated, stored, and made readily-available to its users in the form of a personalized travel timeline. Accordingly, we affirm.

We glean the following factual history from the testimony and evidence presented at trial. At approximately 2:00 a.m. on June 18, 2024, Kelly Urban

_____

[1] *See* 18 Pa.C.S.A. §§ 3701(a)(1)(ii), 3921(a), 2701(a)(3).

("Urban") was working the night shift alone at the Turkey Hill convenience store located at 1501 Manheim Pike, Lancaster County, Pennsylvania, when Jones entered the store and approached her while she was busy preparing coffee. When Urban turned to address Jones, she noticed that he was covering his face with a ski mask, wearing all black clothing, and holding onto the butt of a large rifle protruding from his pants. Jones subsequently walked behind Urban and motioned her to the store's cash register, whereupon she complied with his verbal commands to give him the money in the register's drawer, totaling $303.93, and a pack of cigarettes. Although Urban could not place Jones' identity at the time, she believed that his bulging eyes matched those of a customer who had been in the store previously. Soon after Jones received the money and the pack of cigarettes, he fled from the store, thus allowing Urban to notify the police. Approximately one and one-half hours after the robbery, Jones visited a Sheetz convenience store, as reflected in the store's surveillance video, where he exchanged $305 in cash for an in-kind deposit to his Cash App account before returning home.[2]

A couple of days later, Urban received a friend request from Jones on Facebook, which she noted he had attempted to rescind shortly after sending. In her ensuing review of Jones' Facebook profile, which displayed multiple

---

[2] At trial, a loss prevention specialist at Sheetz explained that the Sheetz store Jones visited after the robbery accepts Cash App deposits without any fee, and that when it performs this service, a "customer would give the store['s] cashier [paper] money[,]" in exchange for the cashier depositing that same amount of money into the customer's Cash App account by scanning a barcode on the customer's phone. N.T., 11/5/25, at 207.

images and videos of Jones, Urban realized that Jones' bulging eyes, dreadlocks, and deep voice matched those of the masked individual who recently robbed the Turkey Hill store. Urban relayed this identification to police, who obtained and executed a search warrant on Jones' house, before ultimately arresting him.

Notably, following Jones' arrest, police seized Jones' cell phone and tablet and obtained a search warrant for their contents. In accordance with this warrant, Detective Anthony Lombardo ("Detective Lombardo") gained access to the two devices,[3] whereupon he discovered that: (1) Jones had synched the data on the two devices together; and (2) Jones' Google Maps account, which had a GPS timeline feature enabled, placed Jones at the scene of the crime during the robbery. To document these discoveries, Detective Lombardo took multiple screenshots of the contents of each device throughout his search. The Commonwealth thereafter charged Jones with each of the above-listed crimes.

On the date scheduled for a jury trial, Jones presented the court with multiple motions *in limine*, including a "[m]otion to exclude information gathered from Google Map[s] data for insufficient foundation[,]" averring that

---

[3] We note that although Detective Lombardo testified that Jones' girlfriend provided him with the passcode to Jones' tablet, he did not otherwise explain how he gained access to Jones' cell phone. **See** N.T., 11/5/25, at 228. Nevertheless, Detective Lombardo's testimony that he was "able to interact with the phone" to the extent that he was "viewing it, [and] going through it," in the same way he did with the tablet indicates that he obtained a similar level of access to this device as well. **Id**.

the Commonwealth could only introduce this GPS timeline data into evidence via expert testimony.  N.T., 11/4/24, at 20-21.  In response to this motion, the Commonwealth's attorney argued that an expert was not necessary to introduce this data into evidence, as Detective Lombardo could testify to the screenshots he took of the Google Maps timeline in his capacity as a layperson familiar with the Google Maps app and its features, elaborating as follows:

> [The Commonwealth would] specifically ask Detective Lombardo about taking screenshots of [the Google Maps GPS timeline data] by a piece[-]by[-]piece nature.  Specifically what [Detective Lombardo] did was he took [Jones'] phone[,] went to Google Maps and the Google Map[s] data[, and i]t indicates who the account holder is, specifically, jones.keuwan314@gmail.com.

> * * * *

> So basically, this is a screenshot of [Jones'] phone. [Detective Lombardo] went to Google Maps and clicked on the account button, which indicated a picture of [Jones] as well as his name, . . . and he went to Your Time[l]ine.  Detective Lombardo will testify that the time[]line basically shows a time[]line of all of the routes [Jones] traveled during the day.

> So this is a screenshot of the time[]line from [the date of the robbery, and] at the time of the robbery [it] indicates that [Jones] left his home at 1:35 a.m.  He's traveling from 1:35 to 1:47 [a.m.], went to Hilton Garden Inn in Lancaster, which is directly next to the Turkey Hill, [and] was there until 2:01 a.m. Those times correspond to the exact times of the robbery.  And then . . . it shows travel [from] 2:01 to 3:51 [a.m.] in which [Jones'] phone also went to Sheetz, which is corroborated by [the store's surveillance] video, [before it traveled] back to his home at 3:51 [a.m.]

*Id*. at 30-31.  The trial court subsequently denied Jones' motion.  In doing so, the court specifically instructed that Detective Lombardo could only "testify as

to his experience with the [Google Maps] app[]" and that it would require an expert to answer any questions "beyond how the app[] work[ed and its] so-called back[-]room function." *Id*. at 36-37.

The matter proceeded directly to trial, during which the Commonwealth presented testimony from Urban, Detective Lombardo, a loss prevention specialist at Sheetz, the manager of the Turkey Hill store that was robbed, and a digital tool forensic analyst. Urban identified Jones at trial based on her belief that his eyes, dreadlocks, and deep voice matched those of the individual who robbed the Turkey Hill convenience store. As it specifically pertains to the Google Maps GPS timeline data at-issue, Detective Lombardo testified as follows:

> [Commonwealth's Attorney]: . . . What device did you seize from . . . Jones?
>
> [Detective Lombardo]: Cell phone and tablet.
>
> * * * *
>
> Q. Did you get a search warrant for that phone and tablet?
>
> A. I did.
>
> Q. And were you able to – did [Jones' girlfriend] give you the passcode to the tablet?
>
> A. She did.
>
> * * * *
>
> Q. . . . So you were able to interact with the phone that you retrieved from . . . Jones; is that right?
>
> A. Yes, if interacting means viewing it, going through it, yes.

Q. And were you able to do the same with the tablet?

A. Yes.

Q. Based off your review of both the phone and the tablet, did you notice any similarities about the data on these devices?

A. Yes. I could determine they were synched together.

Q. . . . What do you mean by synched?

A. They both contain the same data. You can combine devices if you have, let's say, an iPad and iPhone. You can synch them. So everything on your iPhone is on your iPad.

Q. Now, did you take what I'll call yield screenshots of these devices?

A. I did.

Q. So can you explain what I mean by yield screenshots?

A. Yes. So when I manually went through the device, I would take pictures as I was going through it, so that digitally you can see what I was seeing.

Q. You would use your phone to take pictures of what [the] phone that you were looking at contained?

A. Basically, yes.

* * * *

Q. Did you access . . . Google Map[s on the cell phone]?

A. I did.

Q. Are you able to tell the jury, just as a lay person, what is Google Maps?

A. Google Maps is on most devices nowadays. Most people use it for navigating, for driving. It also extends to a lot of other apps that people don't even realize. It kind of tracks where you are.

That is kind of why you get certain ads that you do and things of that nature.

It also utilizes if people have to find your iPhone. I don't know what the Android equivalent would be, but if you lose your phone, you can log in from another device and basically it's a GPS. Your device is enabled and it allows you to track it. It keeps a history of it.

Q. Do you use Google Maps in your everyday life?

A. I do.

Q. Do you rely on it to get to where you're going?

A. Yes, I do.

Q. So if you would go to a location and you would type in the Turkey Hill on Manheim Pike, you would rely on the directions it told you to go?

A. I would and it gives me the direction because my GPS is enabled and knows where I am, so it tells me how to get there.

Q. So knowing that from a user of Google Maps, did you go on to . . . Jones' Google Maps?

A. I did.

Q. And I specifically direct your attention to Slide 37. Is this you going on to . . . Jones' phone?

A. Yes, it is.

Q. Specifically what are we looking at here?

A. So that's going inside . . . Google Maps, which is an app[]. The little icon you see on the device you have, you click that and then, like most other app[s], usually at the top right corner is where your log-in stuff or your settings or whatever. Click that and it would open that.

Q. In this case, this is the menu of options that you are presented with?

A. Yes.

Q. What did you use to find out more information?

A. Well, first I verified that it was actually his. It was signed into him, and then I looked at Your Time[l]ine, which basically is a report of your locations.

Q. In so doing, is this what you discovered on June 18, 2024?

A. Yes, it is.

Q. So I'm going to do this in two parts. What [does] the top half of this depict?

A. It's actually a visual map of like the location and like the blue lines would be like the travel and it's got like Hiton Garden Inn is highlighted. It has Home listed as 516 Candlewyk Road, and it also has Sheetz.

* * * *

Q. Are there also times specific to this travel located in the app?

A. There are.

Q. Could you tell the jury what those times are?

A. Yes. So it lists that he traveled from 516 Candlewyk Road, which is listed as Home, and left at 1:35 a.m. This would be on June 18th. Then it says driving for .2 miles, 12 minutes from 1:35 a.m. to 1:47 a.m., arriving at [the] Hilton Garden Inn [directly adjacent to the Turkey Hill], and was at that location from 1:47 a.m. to 2:01 a.m.

* * * *

A. So from 2:01 a.m. to 3:51 a.m., it lists travel period of 1.6 miles, an hour and fifty minutes, and then lists Home, which is 516 Candlewyk Road and it's cut off.

Q. So we'll go to the next slide where it's not cut off. Can you share with us what the data says below that?

A. Yes. So from at Home, which is 516 Candlewyk Road, 3:51 a.m. to 11:21 p.m.

Q. And were you able to also access the same data on the tablet?

A. Yes.

* * * *

Q. Now, the thing I want to direct your attention to [in reference to Slide 42, which deals with the written information of the route and stopping points,] is this icon of up and down arrows in sort of the middle of the screen to the right. What is that?

A. That expands that block of information.

Q. And when it expands that block, do we get Slide 43? Can you share what that expanded block says?

A. Yes. So it says from 2:01 a.m. to 3:38 a.m. it lists it as driving for a period of [one] hour and [thirty-eight] minutes covering a one-mile area, and then it lists being at Sheetz . . . from 3:38 a.m. to 3:45 a.m., and then leaving there at 3:45 a.m. and arriving back at home at 3:51 a.m.

Q. So did you take steps to confirm some of the locations that we're talking about . . .?

A. Yes, I did.

Q. What is an example of that?

A. An example would be the Sheetz [surveillance] video. It's corroborated by the video, same time stamp as Google Maps is saying he arrived there and when he left. It's the same.

Q. And did you make any other attempts to match Google Maps data with known locations?

A. Well, during the time of the robbery, . . . Jones['] device puts him at the Hilton Garden Inn, which is directly beside the Turkey Hill.

- 9 -

Q. What about – without telling me specifics on other dates – were you able to corroborate Google Maps was generally accurate in regards to his location?

A. Yes.

N.T., 11/5/25, at 227-29, 232-38.

On cross-examination, defense counsel questioned Detective Lombardo regarding perceived inconsistencies within the Google Maps GPS timeline data, as follows:

[Defense counsel] There was – you and I talked this morning about you traveling . . . from Candlewyk down to Turkey Hill.

[Detective Lombardo] Yes.

Q. Past the specialty shop and past KeepSafe.  You estimate that about half a mile.

A. Roughly, yes.

Q. According to this Google location data, it has . . . Jones leaving at 1:35 -- look at this – if I am reading this right, that says 0.2 miles.

A. Yes, it does.

Q. We can agree that is not a half a mile.  It's a quarter mile?

A. Correct.

Q. And it says driving, and it took [twelve] minutes?

A. Yes, it does say that.

Q. Can we agree it seems a little bit odd based on you having to walk that distance, knowing how far it is to walk, and knowing the driving route?  Would you agree from knowing that that 0.2 seems a little bit high?

A. I'm not sure --

Q. Wouldn't it take longer to drive around? I think you said that this morning.

A. At that point, it would be a longer route to drive.

Q. The 0.2 miles, that seems a little bit odd?

A. Yes.

Q. Basically, it's impossible to take two-tenths of a mile to drive all those blocks around to get to Turkey Hill?

A. Yes. I would think it would be longer.

Q. So Google generally is accurate, but at least for that part we can agree that doesn't appear to be accurate?

A. And the fact that it says driving, yes.

Q. Two-tenths of a mile?

A. Not sure about the distance because it could just be actually walking, but it picked it up as driving. I don't know. And the distance could actually be accurate.

Q. I don't want to belabor it. I think you understand the point I'm making.

*Id*. at 247-48.

Jones did not present an expert on Google Maps to provide testimony at trial regarding the accuracy of the app or to explain the perceived discrepancies in the app's GPS timeline data, as taken from his cell phone. Nor did he testify in his defense. At the conclusion of the trial, the jury convicted Jones of robbery, theft by unlawful taking, and simple assault. On January 21, 2025, the trial court sentenced Jones to an aggregate term of ten

to twenty years' imprisonment.[4]  Jones filed a timely notice of appeal, and both he and the trial court complied with Pa.R.A.P. 1925.

Jones raises the following issue for our review: "Did the trial court err in admitting evidence of the Google Maps [GPS] timeline [data] on . . . Jones' cell[ ]phone through the testimony of Detective . . . Lombardo, where this timeline contained glaring inaccuracies and unexplained details which could only be explained by a Google Maps expert?"  Jones' Brief at 6.

Jones' sole issue challenges the admissibility of evidence at trial.  We review a trial court's evidentiary rulings to determine whether the court abused its discretion.  **See Commonwealth v. Smith**, 325 A.3d 513, 518 (Pa. 2024).  "An abuse of discretion is not simply an error of judgment, but is an overriding misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will, or partiality."  **Id**. at 519.

Relevantly, a witness may offer lay testimony in the form of an opinion if it is: (a) rationally based on the witness' perception; (b) helpful to clearly understanding the witness' testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge.  **See**

_____

[4] We note that because Jones robbed the Turkey Hill convenience store while he was serving a probationary sentence stemming from a prior criminal conviction, the trial court proceeded directly to a revocation hearing, whereupon it additionally revoked Jones' probation and imposed a consecutive term of two to five years' imprisonment in the other criminal matter.  **See** N.T., 1/21/25, at 4, 29.

Pa.R.E. 701(a)-(c). However, an expert must testify in relation to evidence that requires explanation via "scientific, technical, or other specialized knowledge . . . beyond that possessed by the average layperson." Pa.R.E. 702(a).

As it relates to the contents of cell phone records, this Court has clarified that "while expert testimony is permissible, there is precedent for the proposition that, where the testimony is non-technical and not beyond the comprehension of laypersons, said testimony is not expert testimony." *Commonwealth v. Grubbs*, 330 A.3d 444, 452 (Pa. Super. 2025) (holding that a police detective's testimony regarding cell phone records did not constitute expert testimony, as the detective "utilized no specialized knowledge in his testimony" when explaining that the cell phone records provided a longitude and latitude for each antenna connected to the defendant's phone at a given time, and he "gave no further information about the operation of cell phones and cell towers").

Conversely, where the subject matter is technical and beyond the comprehension of laypersons, expert testimony is required. As this Court has explained:

> [E]xpert testimony reflects the application of expertise and does not stray[] into matters of common knowledge. We have further explained that expert testimony requires knowledge, information or skill beyond what is possessed by the ordinary juror, and that expert testimony must be distinctly related to a science, skill or occupation which is beyond the knowledge or experience of an average lay person and does not involve[] a matter of common knowledge.

***Commonwealth v. Manivannan***, 186 A.3d 472, 485 (Pa. Super. 2018)
(citations and internal quotation marks omitted). In ***Manivannan***, this Court
held that the trial court abused its discretion by permitting lay witnesses to
testify to the approximate geographical location of users who had accessed an
email account based on their interpretation of multiple disparate IP addresses
logged within the account's settings, as "the connection between IP addresses
and real-world locations requires expert testimony[, for] such information and
any facts derived therefrom cannot be considered common knowledge." ***Id***.
at 488; ***see also Commonwealth v. Carpenter***, 264 A.3d 366 (Pa. Super.
2021) (unpublished memorandum at *5) (observing that a witness presenting
testimony "regarding the technical process of extracting data from a cell phone
and using the [GPS] coordinates found from that data to track a location," is
"required to have some knowledge of (a) the method of location used, and (b)
the accuracy and reliability of that method in the area in question, whether
through personal experience or technical knowledge[,]" and noting that the
witness who provided such testimony at trial "denied any knowledge of how
the coordinates were calculated" and could not address their accuracy or
reliability).

Although this Court has not specifically addressed whether a party must
produce expert testimony to introduce cell phone GPS data via the Google
Maps timeline feature installed on a user's device, this Court has permitted
the entry of similar cell phone location data into evidence via lay witness

- 14 -

testimony. ***See Grubbs***, 330 A.3d at 452 (permitting a police detective to testify as a lay witness to explain that he input coordinates from the defendant's cell phone records into Google to determine their relative location on a map); ***see also Commonwealth v. Montalvo-Rivera***, 341 A.3d 159, 173 (Pa. Super. 2025) (holding that trial court did not err by permitting a police detective to testify to the content of the victim's phone records as a lay witness, as he "did very little more than relay information found in the AT&T service records relative to [the] phone and the legend provided therewith, and certainly did not offer any testimony requiring scientific, technical, or specialized knowledge beyond the understanding of any phone user of average intelligence").

Jones argues that the trial court erred by admitting the Google Maps GPS timeline data into evidence through Detective Lombardo's testimony, as it "contained glaring inaccuracies and unexplained details which could only be explained by a Google Maps expert." Jones' Brief at 20. Jones specifically highlights that the "timeline claimed that he took [twelve] minutes to drive .2 miles between his home" and the Hilton Garden Inn opposite the Turkey Hill, and that it also claimed that he traveled "a distance of 1.6 miles" on his return home from the Hilton Garden Inn, which included his stop at Sheetz. ***Id***. Jones asserts that, based on his calculations of these distances and travel times, "[t]hese driving times are simply incredible and make no sense." ***Id***. "Further, [Jones points out that] the routes displayed on [the] Google Maps

- 15 -

timeline do not follow roads" despite testimony "that [he] was driving." ***Id***. "Additionally[, Jones emphasizes that] the timeline suggests that [he] was riding in his friend['s] vehicle, yet he supposedly, according to his cell[ ]phone reports, was texting him at [the time] in a manner suggesting that the two of them were not together." ***Id***.

Consequently, Jones points out that even though "it appear[ed] that the [GPS] timeline data was inaccurate," he was unable to raise the discrepancies before the court, as they "could not be explained by lay witness, Detective Lombardo." ***Id***. at 20-21.[5] Similarly, Jones avers that "[b]ecause no expert witness was presented to explain the [GPS] timeline data, defense counsel was unable to effectively cross-examine an expert about these inaccuracies." ***Id***. at 21. As it relates to the trial court's determination in its Rule 1925(a) opinion, that these "inconsistencies went to the weight of the evidence, and not its admissibility[,]" Jones disagrees; instead, Jones argues that these inconsistencies were akin to "glaring inaccuracies" that "went to the reliability of the timeline" feature requiring a determination as to "whether the timeline could be admitted without the testimony of an expert to explain and account for them[.]" ***Id***. at 22.

---

[5] As is reflected ***supra***, defense counsel raised these discrepancies to Detective Lombardo on cross-examination, who in-turn conceded that the GPS timeline data in these instances did not appear accurate. ***See*** N.T., 11/5/25, at 247-48.

- 16 -

Jones contends that the trial court improperly concluded that the instant case was similar to *Grubbs*. Jones claims that *Grubbs* is factually distinguishable from the instant case, as "there was no indication that the phone records in *Grubbs* lacked trustworthiness" or were otherwise inaccurate — as he maintains is the case here. *Id*. at 22-23. Further, Jones argues that "a Google Maps timeline is not the same as cell[ ]phone records[,] and there has been no testimony explaining why it should be viewed as accurate" as required by Pa.R.E. 901.[6] *Id*. at 23.

Jones concedes that "[w]hile it is true that [he] was seen entering Sheetz at the time indicated in the Google Maps timeline[,]" thus corroborating the GPS timeline data in that regard, he submits that this alone does not prove "the ultimate question" of "whether he was the person entering Turkey Hill to rob it at the time when the Google Maps timeline showed him to be at the Hilton Garden Inn next door." *Id*. Accordingly, Jones insists that although "we know that someone robbed the Turkey Hill around 2:00 a.m., this fact does not independently corroborate the accuracy of [his] Google Maps timeline, as to do so presumes that [he] is the robber." *Id*. at 24.

---

[6] Pa.R.E. 901 pertains to the authentication and identification of evidence, and it instructs that, "[u]nless stipulated, to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Pa.R.E. 901(a). The rule thereafter provides that testimony by a witness with knowledge "that an item is what it is claimed to be" satisfies the authentication requirement. Pa.R.E. 901(b)(1).

Finally, Jones avers that "[t]he admission of the Google Maps [GPS] timeline data through Detective Lombardo's testimony was not harmless." ***Id***. Jones highlights that: (1) "[n]o one was able to positively identify [him] as the robber of the Turkey Hill[;]"[7] and (2) the Commonwealth's "case was based entirely on circumstantial evidence, of which the Google Maps [GPS] timeline data was particularly significant[,]" as it placed him "near the Turkey Hill at the time of the robbery." ***Id***. Jones asserts that "[i]t was critical that defense counsel [should have been] able to cross-examine a Google Maps timeline app[] expert to evaluate the inaccuracies and unexplained details in the [GPS] timeline data." ***Id***. "For the foregoing reasons, [Jones] argues the trial court erred in admitting evidence of the Google Maps [GPS] timeline on [his] phone through" Detective Lombardo's lay testimony, and that this Court should therefore vacate his judgment of sentence and remand for a new trial. ***Id***.

The trial court considered Jones' issue and determined that it was without merit, reasoning as follows:

> Like the information relied upon in ***Grubbs***, the Google Maps information presented by Detective Lombardo was produced autonomously by the app. And like the detective in ***Grubbs***, Detective Lombardo did not testify as to the details of a specialized or technical procedure, as was required in ***Manivannan***. He simply explained in ordinary terms what the app showed, as any

---

[7] Our review of the record contradicts this assertion, as Urban identified Jones at trial based on her belief that his eyes, dreadlocks, and deep voice matched those of the individual who robbed the Turkey Hill convenience store. ***See*** N.T., 11/5/24 , at 136, 138, 141.

regular user of the app would, informed by their personal yet unspecialized use of its functions.

As [Jones] observes, [his] trial counsel nevertheless highlighted certain inconsistencies in the admitted information. But this goes to the weight of the evidence and not its admissibility. As with any evidence, [Jones] was permitted to cast doubt upon it, and the detective freely admitted certain inconsistencies. Such doubt, however, does not alter whether the Commonwealth demonstrated that the evidence was what they claimed it to be in the first instance: a standard Google Maps record of a particular user's movements, as determined by Google. For in *Manivannan*, *Carpenter*, and *Grubbs*, the court focused on the process through which the evidence was obtained, which necessarily bore on the question of whether it was what the proponent claimed it to be. In *Manivannan*, that inquiry required expert testimony because the Commonwealth itself gathered the evidence through a technical procedure; in *Grubbs*, no such testimony was needed because the evidence was gathered through an automated process without reason to challenge. Thus, in *Grubbs* as here, the evidence was admissible so long as it was what its proponent claimed. The Commonwealth did so here, attributing the Google Maps information to [Jones] through a combination of circumstantial and corroborating evidence. The jury was then permitted to weigh the evidence in accordance with its apparent inconsistencies, other evidence, and their common sense. They did so and returned a guilty verdict.

Trial Court Opinion, 4/21/25, at 9-10 (citations omitted).

After reviewing the record, we discern no abuse of discretion by the trial court in admitting into evidence screenshots of the Google Maps GPS timeline data taken from Jones' cell phone through the lay testimony of Detective Lombardo. While we recognize that our appellate Courts have not previously addressed the issue of whether an expert is required to introduce GPS data recovered from the timeline feature within a cell phone user's Google Maps app, we conclude that in the instant case, the detective's recovery and

interpretation of this data did not require any scientific, technical, or other specialized knowledge.

As indicated by Detective Lombardo, the Google Maps timeline feature is readily-available to users of the Google Maps app within their account settings, and the app presents timeline information in a way that allows the user to track their prior instances of travel using Google's calculation and storage of their GPS coordinates. **See** N.T., 11/5/25, at 232-38. Accordingly, when Detective Lombardo testified that he uncovered Jones' GPS timeline data by simply clicking on the "Your Time[l]ine" function within Jones' Google Maps account settings, he was able to present it without opining as to any of the app's inner-workings, explaining how Google calculated and tracked Jones' GPS coordinates, or providing any additional testimony regarding the accuracy of the data generated by the Google Maps app. **See id**. at 234. Indeed, the trial court's preliminary ruling clearly expressed that such testimony would be beyond the knowledge of the common lay person, and would have required an expert. **See** Pa.R.E. 701(a) – (c); **see also** N.T., 11/4/24, at 36-37.

Instead, Detective Lombardo photographed and discussed the information automatically generated and displayed by the Google Maps app while logged into Jones' user account. **See Grubbs**, 330 A.3d at 452. Consequently, just as we reasoned that the detective in **Montalvo-Rivera** did not offer expert testimony when he merely relayed information found in AT&T service records, Detective Lombardo similarly "did not offer any testimony

requiring scientific, technical, or specialized knowledge beyond the understanding of any phone user of average intelligence" when he solely relayed the information provided by the Google Maps app. ***Montalvo-Rivera***, 341 A.3d at 173. Thus, we conclude the trial court did not abuse its discretion by admitting screenshots of Jones' Google Maps GPS timeline data into evidence absent expert testimony, and we hold Jones' sole issue on appeal is without merit.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/10/2025